# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:16-cv-433-FDW

| | | |
|---|---|---|
| SHAHID HASSAN MUSLIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| ERWIN CARMICHAEL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 26), and on Defendants' Motion to Strike Plaintiff's Surreply, (Doc. No. 45).

## I.    BACKGROUND

Plaintiff filed *pro se* Complaint pursuant to 42 U.S.C. § 1983 that passed initial review on his claim that, while he was incarcerated at the Mecklenburg County Sheriff's Office's ("MCSO") Jail, he was denied the right to practice his religion in violation of the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and he was treated differently from inmates of other religions in violation of the Fourteenth Amendment's Equal Protection Clause. (Doc. Nos. 1, 7). His allegations center around the provision of a religious diet and prayer services for his Islamic faith. The Defendants are Mecklenburg County Sheriff Irwin Carmichael[1] and Mecklenburg County Central Jail Chaplains Dennis and Maddox.

Defendants have now filed a Motion for Summary Judgment that is before the Court for review. (Doc. No. 26). The Court issued an Order on December 5, 2018 informing Plaintiff of the

---

[1] Defendants note that Sheriff Carmichael was replaced by Gary McFadden on December 5, 2019.

importance of responding to the Motion and cautioned him that failure to do so may result in dismissal. (Doc. No. 28). Plaintiff filed a Response, (Doc. No. 38), Defendants filed a Reply, (Doc. No. 42). Plaintiff then filed a Surreply, (Doc. No. 44), which Defendants have moved to strike, (Doc. No. 45).

**(1)** **Complaint** (Doc. No. 1)

Plaintiff alleges that his sincerely held Muslim beliefs require him to eat either kosher or halal meat. He requested a kosher or halal diet that includes meat but was only offered a vegetarian diet even though there was no legitimate penological reason for doing so. This substantially burdened Plaintiff's practice of his religion which he believes to require the consumption of halal meat. The kosher diet satisfies his religious requirements and could be modified to accommodate his medical need for a high-protein diet. He was told, and documents indicate, that he was denied the Kosher diet because he is not Jewish. Providing Kosher meals to Plaintiff could be accomplished for *de minimis* cost and would not cause any administrative or security problems. The only alternative offered to Plaintiff is a vegetarian diet that does not satisfy his religion's requirement to eat meat or his medical need for a high-protein diet which would result in rapid weight loss. Plaintiff was treated "harshly" by the chaplain who ignored and denied his requests. (Doc. No. 1 at 7). Plaintiff appears to allege that the unavailability of a Kosher diet caused him to go on a hunger strike. Plaintiff alleges that documents showing the reason for his denial – the fact that he is not Jewish – are being altered to remove that invalid reason for his denial.

Plaintiff brought to the attention of "facility officials" that a similarly situated Jewish inmate in Plaintiff's housing unit was given the Kosher diet but the officials callously denied and ignored Plaintiff's requests. (Doc. No. 1 at 3-4). The requirement that inmates must profess to follow the Jewish faith to receive Kosher meals has since been removed from the system.

Plaintiff further alleges that Muslim inmates are treated differently from members of other religious groups in that they are provided inadequate services of an Imam. The facility maintains a relationship with only one part-time Imam whereas there are four or five full-time Christian chaplains. The part-time Imam is rarely available to minister to Muslim inmates. During Plaintiff's 30 days at the facility, he only encountered the Imam on three occasions. The facility allows Jumah, Friday congregational prayer service, for three or more inmates but the unavailability of the Imam to lead the service makes this alternative means a farce. In Plaintiff's 31 months at the facility, an Imam led one Jumah prayer even though the requisite number of inmates was present on every occasion.

Plaintiff appears to seek compensatory and punitive damages and injunctive relief.

**(2)** **Defendants' Motion for Summary Judgment** (Doc. No. 26)

Defendants argue that Plaintiff's official capacity claims against Dennis and Maddox should be dismissed because they are redundant of the official capacity claims against Sheriff Carmichael. Plaintiff failed to exhaust administrative remedies with regards to the claims against Carmichael and Maddox, and all claims alleging that Defendants failed to provide an Imam to lead prayer services in the first and second claims for relief, and the equal protection claim alleging disparate treatment regarding prayer meetings in the third claim. There are no allegations that Carmichael or Maddox were personally involved in any of the constitutional deprivations. Plaintiff's First Amendment and RLUIPA claims fail because his rights to worship and eat religious meals were never substantially burdened. Further, the RLUIPA claim fails because Plaintiff has been moved from the Jail, which renders injunctive relief moot, and monetary damages are not available under the RLUIPA. Finally, Defendants argue that they are entitled to qualified immunity for any claims against them in their individual capacities because provision of

3

a religious meal without meat that is consistent with Islamic beliefs and affording volunteer Imams for inmates do not violate any clearly established right.

**(3)** <u>**Plaintiff's Response**</u> (Doc. No. 38)

The Court issued an Order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), instructing Plaintiff regarding his right to respond to Defendant's Motion. (Doc. No. 28). Plaintiff filed a Response arguing that are genuine disputes of material fact for trial. He claims that he has been denied his right to discovery and that the disputed documents are relevant to prove Defendants' liability and Plaintiff's claim of injury and damages.[2] Plaintiff contends that discovery will show that Defendants' actions substantially burdened Plaintiff's ability to practice his religion, and will produce probative evidence that affirmatively establishes that Defendants put substantial pressure on Plaintiff to modify his behavior and violate his beliefs. Defendants' argument that any burden on Plaintiff was reasonable is an admission and shows that a material issue exists for trial. According to Plaintiff, Defendants concede that even if Plaintiff's RLUIPA claims are not moot and damages are authorized, the RLUIPA claim still fails. This concession is an admission and shows that a material issue for trial exists. He claims that Defendants further concede that, to prevail on equal protection, Plaintiff has to show he was treated differently from similarly situated persons. Their concession is an admission and discovery would support Plaintiff's claim. Plaintiff also claims that Defendants concede that, if Plaintiff can demonstrate any violation of constitutional rights, they are protected by qual immunity; this concession is an admission and a genuine issue of fact exists for trial. Plaintiff argues that he has shown that a genuine issue exists for trial and that he will present sufficient probative evidence from which a reasonable jury could

---

[2] Plaintiff's Motions for Extension of the Discovery Deadlines, (Doc. Nos. 24, 32), and Motion to Compel, (Doc. No. 25), have been denied. <u>See</u> (Doc. No. 49).

return a verdict for Plaintiff. He argues that Defendants are not entitled to judgment as a matter of law and asks the Court to grant his Motion to Compel and strike Defendants' Motion for Summary Judgment, impose sanctions, and stay further proceedings until Defendants obey their discovery obligations.

Plaintiff filed a Notice of Appeal with his Response, (Doc. No. 40), that was transmitted to the Fourth Circuit Court of Appeals, (Doc. No. 41). The interlocutory appeal was dismissed for lack of prosecution on April 4, 2019. <u>See</u> (Doc. No. 48).

**(4)  <u>Defendants' Reply</u>** (Doc. No. 42)

Defendants assert that Plaintiff has not complied with the <u>Roseboro</u> order in that he sets forth no admissible evidence to demonstrate that there is a genuine issue of fact on any issue. Instead, Plaintiff argues that discovery would lead to admissible evidence to rebut Defendants' claims. Plaintiff refers to his Motion to Compel but he fails to specify what documents would produce probative evidence and Plaintiff had adequate time to complete discovery. Moreover, Plaintiff has not filed any affidavits in support of his request to delay summary judgment. Plaintiff's request to create an issue of fact by claiming he is entitled to discovery should be denied. The only substantive argument that Plaintiff has made is with regards to the substantial burden argument. He states that a prisoner has a right to a diet consistent with his religious scruples. He also states that a substantial burden under the First Amendment and RLUIPA exists when a government put substantial pressure on an adherent to modify his beliefs. Defendants do not dispute this contention, however, Plaintiff does not state any facts demonstrating that Defendants' actions caused him to modify his beliefs. The religious meal offered to Plaintiff was consistent with Islamic law. Defendants also provided opportunities for Islamic inmates to worship as they wished and Plaintiff participated in Ramadan observances. There was no pressure placed on

Plaintiff to change his religious beliefs at the Jail.

**(5)** __Plaintiff's Surreply__ (Doc. No. 44)

Plaintiff filed a Surreply to which he attached his own Affidavit. He argues that the facts and admissible evidence show that Plaintiff did exhaust all administrative remedies at MCSO. The grievance policy requires the inmate to have one level of appeal., and the initial response must be made within 72 hours. Plaintiff exhausted his administrative remedies on July 13, 2015 at 2:26 PM, May 17, 2016 at 2:39 PM, May 19, 2016 at 9:32 AM, May 27, 2016 at 2:35 PM and on June 6, 2016 at 7:53 AM.

Plaintiff alleges that he has been treated differently from similarly situated inmates and the difference is not due to a legitimate penological interest. Defendants are personally liable because they adopted and implemented detention policies and practices for the purpose of discrimination rather than for a neutral investigative or penological objective and failed to properly supervise their subordinates' duties, and due to adoption and implementation of policies and practices for the purpose of discrimination.

Plaintiff claims that Defendants concede that Plaintiff's substantial burden argument is "substantive." (Doc. No. 44 at 9). He further argues that Defendants' failure to properly discharge their duties put substantial pressure on Plaintiff to violate his religious beliefs. By repeatedly trying to frustrate the discovery rules, they tacitly admit that further probative evidence exists that substantiates Plaintiff's claims.

Plaintiff seeks costs and expenses, asks the Court to accept his designated facts, prohibit Defendants from supporting their defense or opposing Plaintiff's facts, striking Defendants' Motion for Summary Judgment in whole or in part, stay these proceedings until the Motion to Compel is obeyed, render default judgment for Plaintiff, and enter a contempt order against

Defendants. Plaintiff reserves the right to full disclosure of the requested discovery prior to summary judgment.

In the Affidavit attached to the Surreply, (Doc. No. 44 at 12), Plaintiff discusses the Motion to Compel and largely reiterates the arguments presented in his Surreply.

**(6)** **Defendants' Motion to Strike Surreply** (Doc. No. 45)

Defendants argue that the Surreply should be stricken because Plaintiff filed it without leave of court and it does not comply with Local Rule 7.1(e). Defendants go on to argue that summary judgment should be granted even if the Surreply is not stricken. Although Plaintiff claims that his right to exercise was substantially burdened, he does not contradict any of the sworn testimony in Defendants' Motion for Summary Judgment that the meals offered were consistent with Islamic law, that Defendants provided opportunities for Islamic inmates to worship as they wished, and that Plaintiff participated in Ramadan observances. There is no evidence of any pressure for Plaintiff to change his religious beliefs at the Jail.

**(7)** **Plaintiff's Response to Defendants' Motion to Strike** (Doc. No. 46)

Plaintiff argues that he has complied with the Court's Local Rules because his filing is a Reply rather than a Surreply and he is permitted to respond to Plaintiff's Motion for Summary Judgment. He further states that all of his evidence is admissible. He states that his Notice of Appeal, (Doc. No. 40), was intended to be held in abeyance until the Court denied Plaintiff's relief on Motion to Compel. He reserves the right to appeal if the court denies the Motion to Compel and requests a copy of his Complaint and the imposition of sanctions against Defendants.

**(8)** **Evidence**[3]

    **(A)** **Declaration of Tom Barei** (Doc. No. 26-2)

---

[3] This section is not exhaustive.

Food Services Manager for Aramark Food Services, Tom Baraei, states that Aramark provides meals to inmates at the Jail. Baraei manages the food service delivered to inmates at the Jail.

Aramark provides approximately 11 different diets to inmates at the Jail including regular diets, medical diets, and religious diets. Diets are color-coded. For instance, the turquoise diet is a medical high-protein diet. The Jail's religious diet is plant-based and contains no animal products. It was designed specifically to meet the dietary needs of offenders who, for religious reasons, require a non-pork diet and whose dietary requirements cannot be accommodated with food in the regular menu. It consists of rice, beans, fruit and vegetables, with no meat, dairy or poultry. The proteins are beans and peanut butter. The meal is 3,000 calories per day. This diet "complies with all the rules of dietary needs for all religious beliefs, except for prisoners who require kosher diets." (Doc. No. 26-2 at 3).

The religious meal has been certified as "meeting or exceeding minimum daily nutritional requirements." (Id.). The meal does not contain halal meat. In order for meat to be halal, separate storage facilities, cooking areas, and utensils would have to be provided. The cost of purchasing halal meat on the open market is "prohibitively expensive." (Id.). There would also be increased costs associated with providing separate storage facilities, cooking areas, ovens, and cooking utensils for halal meats.

Aramark provides kosher meals for Jewish inmates. The kosher meals are prepared separately. For kosher meals, you cannot prepare meat and dairy at the same time so kosher meals are specially ordered. The kosher meals cost approximately $5.25 per meal and the other meals are approximately $.95 per meal. There is little space in the kitchen to prepare kosher meals. There is one microwave and meals cannot be mixed. It also takes about six minutes for a meal to cook.

**(B)** **Declaration of Frank Tallerico** (Doc. No. 26-3)

Inmate Program Specialist in the Inmate Programs Department of MCSO, Frank Tallerico, worked with the Jail's Chaplain Unit from August 22, 2012 through January 2, 2018. He is familiar with the programs offered in the Chaplain Unit.

In 2016, the Jail had three full-time Associate Chaplains and one part-time Chaplain. Defendant Dennis was the Senior Chaplain until he retired on July 1, 2018, and Defendant Maddox was an Associate Chaplain. The job of a chaplain is to ensure that inmates have the opportunity to address the issues they face on a spiritual level that may have contributed to their criminal behavior and subsequent incarceration through spiritual maintenance, pastoral care, and various religious studies.

As Senior Chaplain, Defendant Dennis was primarily responsible for supervising and overseeing the other chaplains. Defendant Maddox was primarily assigned to carry out chaplain duties at Jail North. All chaplain staff are nonsectarian and are responsible for helping inmates of all faiths connect with their local faith community.

In addition to salaried chaplain staff, the Jail uses volunteer Chaplain Aides and volunteer religious study instructors. Chaplain Aides are volunteers who assist chaplain staff with providing spiritual talks to inmates, conducting religious studies, and providing religious literature to inmates. Religious study instructors come into the Jail on predetermined days and times to provide religious instruction to inmates who voluntarily request to be part of a religious study.

The Chaplain's Unit provides opportunities for all inmates, including Islamic inmates, to study with representatives from their respective faith traditions. The Chaplain's Unit welcomes Imams to meet with inmates who desire a visit. Imams come on a voluntary basis. There is an application process including a background check and training process called Fundamentals of

Working in a Jail which is one time per month. The Chaplain's Unit solicits assistance from Imams from local mosques.

If a Chaplain Aide volunteer goes through the application process and completes training, they are given a green identification card which allows them to conduct a face-to-face visit with anyone requesting a visit from their religious group. Chaplain Aides are allowed to visit an inmate who requests a visit for prayer request or spiritual counseling during normal business hours.

Imams who have been issued MCSO credentials are allowed to come to the Jail during normal business hours, but generally come to the Jail when their schedule permits. Imams are allowed to visit inmates requesting a visit for Muslim services, such as Jumu'ah Prayer, Tallem or educational study, or spiritual counseling.

During Plaintiff's time at the Jail, Imam assistants from the local Masjid, including Jibril Muhaymin, Lawrence Muhammed, and Hakeem Fateen, volunteered at the Jail. The Chaplain's Unit had asked Mr. Muhaymin to find additional Imam or Imam assistants to come to the Jail. Inmates are also encouraged to reach out for approved volunteers.

Inmates are allowed to participate in Jumu'ah prayer which is on Friday afternoons. If an Imam is not available, a POD officer may authorize a group of inmates to conduct their own Jumu'ah prayer if safety and security permit. Inmates are also allowed to engage in daily prayer in their rooms. During Ramadan, inmates can sign up to participate in Ramadan.

The Chaplain's Unit solicits donations of Korans and other Islamic literature from local mosques. Inmates can request a Koran from the Chaplain's Unit. If an inmate requests a Koran from the Chaplain's Unit, one is provided free to them. If a Koran is not available at the Chaplain's Unit, inmates may check a Koran out from the Jail Library.

In addition to having the Koran, the Jail library has five Hadiths, a collection of traditions

containing sayings of the Prophet Muhammad. There are also seven children Islamic books and an Islamic study book at the library.

Inmates may request religious meals from the Chaplain's office and religious meals are provided to inmates who request it. However, if an inmate is on a special medical diet, the inmate is not given the religious meal unless jail medical staff certifies that the religious meal will not affect the inmate's health.

According to Tallerico's understanding of Islamic law, which is based on conversations with Islamic religious authorities, it is forbidden for Muslims to eat ham, pork, or animal blood. According to the food provider, the religious meal served at the jail does not contain ham, pork, or pork byproducts.

**(C)** **Declaration of Sheila Burns** (Doc. No. 26-4)

Sheila Burns is employed by Correct Care Solutions, which provides inmate medical care at the Jail, as Head Nurse. For health reasons, some inmates are placed on medical diets of which there are several types. When an inmate who is on a medical diet requests a religious diet, Jail medical staff determines whether the religious diet will adversely affect the inmate's health. Requirements for specific medically prescribed diet will override an inmate's preference for a religious diet. If the Jail medical staff determines that the religious diet will not adversely affect the inmate's health, the inmate is given the religious diet.

Burns reviewed Plaintiff's medical records, which are kept in the ordinary course of business at the Jail. Plaintiff was placed on a high-protein medical diet on January 17, 2014. On May 12, 2016, the high-protein medical diet was discontinued and Plaintiff "was allowed to have a regular house diet or religious diet." (Doc. No. 26-4 at 3). On May 12, 2016, an evening snack bag and one serving of peanut butter was added to Plaintiff's diet.

**(D)**      <u>**Declaration of Carolyn Ashe**</u> (Doc. No. 26-7)

MCSO Inmate Grievance Coordinator Carolyn Ashe maintains inmate grievance forms as part of her job duties. Pursuant to the Jail's written policy, (Doc. Nos. 26-8, 26-9), if an inmate has a grievance, he or she may voice an informal grievance to the POD supervisor. The POD supervisor determines the nature of the complaint and attempts to resolve the problem. If the POD supervisor cannot resolve the problem, the inmate will be instructed to make a formal complaint using the kiosk. After the inmate has completed their grievance, the inmate is responsible for checking the system for a response within seven days. Any emergency grievance will be verbally reported to the sergeant on duty. As each grievance is answered, the inmate will have access to his or her response, and the responses to grievances are tracked. All grievances are answered within seven days, excluding weekends and holidays. If an inmate is dissatisfied with the response, they may appeal within seventy hours of the response.

Inmates are informed of the Jail's grievance policy via the kiosk when they arrive at the Jail. Each inmate receives an inmate handbook via the kiosk which details the policies and procedure applicable to inmates at the Jail. Included in this handbook is a section entitled "Requests and/or Grievance Forms" which summarizes the grievance process at the Jail. (Doc. No. 26-7 at 3).

According to the Jail's grievance files, Plaintiff filed 23 grievances and requests from 2013 to 2016. He did not file any grievances against Defendants Carmichael or Maddox. The only grievances he filed as a result of wanting a kosher diet were on January 27, 2015, May 17, 2016, May 18, 2016 and May 23, 2016. Plaintiff never filed grievances concerning the failure of the Sheriff's Office to provide an Imam to lead prayer services or complaints about equal protection violations based on disparate treatment with Christian inmates.

**(E)** **Inmate Summary** (Doc. No. 26-6)

Plaintiff was released from the Jail on July 27, 2016 and is now in the custody of the Federal Bureau of Prisons where he is serving a life sentence. <u>See</u> (Doc. Nos. 26-6, 26-11).

**(F)** **Medical Records** (Doc. No. 26-5)

1/17/14           <u>Physician's Order</u>: high protein diet (Doc. No. 26-5 at 2)

5/12/16           <u>Physician's Order</u>: "d/c current diet order. May have regular house diet or religious diet as indicated." (Doc. No. 26-5 at 3)

<u>Physician's Order</u>: "add to prior diet order evening snack bag plus one serving of peanut butter nightly." (Doc. No. 26-5 at 4)

<u>Medical Diet Order</u>: "Snack bag plus one service of peanut butter nightly." (Doc. No. 26-5 at 6)

<u>Infirmary Progress Note</u> 2:06 PM by D Biondi: "Patient is in infirmary for hunger strike. Continue to consume only water, gatoraide, and boost. Reports no symptoms. Tells me the reason for this action is inability to get a Kosher diet to comply with his Muslim faith. He was placed on a high protein diet for weight loss upon incarceration but it was never changed back to a regular diet and the medical order is preventing him from obtaining a religious diet compliant with his faith. He has stable weight and only minimal weight loss during this hunger strike." (Doc. No. 26-5 at 7)

<u>Infirmary Progress Note</u> 8:19 PM by A McVay: "I/M continues with Hunger Strike day 13. I/M stated he will start eating once his kosher diet is reinstated. I/M continues to be monitored. I/M has peanut butter in top drawer of med car. I/M was offered a Boost but denied. I/M continues to deny all meals. I/M did have water and Gatorade today several cups. No s/s of discomfort noted…. No medical concerns were voiced today." (Doc. No. 26-5 at 5)

5/13/16           <u>Infirmary Progress Note</u> 11:43 AM by D Popichak: "Patient is on meal monitor. Pt is taking oral nutrition supplements and GatorAid. A regular diet tray has been ordered and is being offered to the patient at every meal." (Doc. No. 26-5 at 7).

<u>Infirmary Progress Note</u> 11:46 AM by D Popichak: "Patient is on a meal monitor (not hunger strike per procol). Pt is taking oral nutrition supplements and GatorAid. A regular diet tray has been ordered and is being offered to the patient at every meal." (Doc. No. 26-5 at 5)

**(G)**     <u>Grievances</u> (Doc. No. 26-10)

6/25/14                <u>Request 15212</u>: "IM CURRENTLY ON THE TURQUOISE HIGH PROTEIN DIET ALONG WITH TWO OTHER INMATES AND WE ALL CONCUR THAT IN EVERY MEAL OUR MAIN PORTION IS VERY UNDERSIZED…. PLEASE RECTIFY THE ISSUE SO THAT WE CAN HAVE FULL SIZE PORTIONS, AND PERHAPS SWITCH US OF THE BOLOGNA FOR PEANUT BUTTER FOR THE SNACK BAG." (Doc. No. 26-10 at 2)

6/26/14                <u>Response 15212</u>: Sustained: "All portions are measured to comply with the standards set by the registered dieticians and have been approved by the county. The Menu meets all state requirements for both nutrition and calories. But we are going to check with the diet Supervasor [sic] about this issue." (Doc. No. 26-10 at 2)

6/28/14                <u>Request 16996</u>: "I WAS TOLD THAT RAMADAN BEGAN TODAY AND AS I HAVE BEEN SUBMITTED FOR THE RAMADAN FOOD SERVICE I DID NOT RECEIVE EITHER MY LUNCH OR DINNER TRAY. NOW I AM TOLD THAT EVEN THOUGH IT BEGAN TODAY MY FOODSE4VICE [sic] DOESN'T BEGIN TIL TOMORROW SO NOW I WILL NOT EAT TODAY." (Doc. No. 26-10 at 3)

6/30/14                <u>Response 16996</u>: Sustained: "Sorry about this, we started Ramadan Saturday when the sundown." (Doc. No. 26-10 at 3)

7/6/14                  <u>Request 21245</u>: "THE TIMES WE ARE GETTING OUR TRAYS ARE EXTREMELY LATE WERE SUPPOSED TO RECEIVE THEM AT 830 BUT MOST DAYS WE AREGETTING [sic] THEM AT 915 930 AFTER A WHOLE DAY FASTING THAT IS VERY DIFFICULT. PLEASE TRY AN [sic] FIX THIS ISSUE." (Doc. No. 26-10 at 4)

7/7/14                  <u>Response 21245</u>: Sustained: "Sorry about this issue we would looking [sic] into this matter." (Doc. No. 26-10 at 4)

7/20/14                <u>Request 29076</u>: "I WAS TOLD TODAY THAT IF YOU HAD FOOD IN YOUR ROOM THAT THE CHAPLAIN INSTRUCTED OFFICERS TO REMOVE YOU FROM THE RAMADAN DIET. I RECEIVE A SNACK BAG AND I THINK IT IS RIDICULOUS THAT WE WOULD [BE] TAKEN OFF FOR HAVING IT." (Doc. No. 26-10 at 5)

7/21/14                <u>Response 29076</u>: Flagged as "not a grievance;" Closed by W.C. Dennis: "I am glad I was able to speak with you about this matter. Your name is still in the Ramadan List." (Doc. No. 26-10 at 5)

| | |
|---|---|
| 9/2/14 | Request 52813: "THE QUALITY OF THE FUDGE BROWNIE HAS DEGRADED…. WE NEED THE ORIGINAL BROWNIE BACK PLEASE." (Doc. No. 26-10 at 6) |
| 9/3/14 | Response 52813: Sustained: "Thank you for brining this matter to our attention, we will look into this issue." (Doc. No. 26-10 at 6) |
| 1/27/15 | Request 127701: "I WOULD LIKE TO BE PUT ON THE KOSHER DIET BECAUSE IT IS EXACTLY COMPARABLE TO THE HALAL DIET, THEY ARE INTERCHANGEABLE, I DO NOT WANT THE RELIGIOUS DIET IN PARTICULAR BECAUSE IT IS ESSENTIALLY VEGETARIAN FARE AND I AM ON TURQUOISE DIET DEALING WITH WEIGHT LOSS ISSUES. THE BAG LUNCH CAN SIMPLY BE CHANGED TO PEANUT BUTTER. I AND MY ATTORNEY WOULD VIEW IT AS DISCRIMINATORY PRACTICE IF YOU WERE TO DENY ME /A DEVOUT MUSLIM/ THE KOSHER DIET BUT PROVIDE IT TO DEVOUTLY JEWISH INMATE THE DOUBLE STANDARD WOULD BE CLEAR AND IRREFUTABLE. PLEASE RESPOND BEFORE MAKING ANY ADJUSTMENTS TO MY DIET. ONCE AGAIN THE RELIGIOUS DIET IS NOT AN ACCEPTABLE SUBSTITUTION." (Doc. No. 26-10 at 7) |
| | Response 127701: Sustained: "All requests for religious meals must go through the chaplain." (Doc. No. 26-10 at 7) |
| 1/31/15 | Request 130119: "I SENT A REQUEST AND IT WAS CLOSED WITHOUT RESPONSE, PLEASE ADDRESS." (Doc. No. 26-10 at 8) |
| 2/2/15 | Response 130119: Denied; no comment given (Doc. No. 26-10 at 8) |
| 2/6/15 | Request 133252: "I MADE A REQUEST THAT WAS CLOSED WITHOUT ANSWER PLEASE RESPOND." (Doc. No. 26-10 at 9) |
| | Response 133252: Denied, no comment given (Doc. No. 26-10 at 9) |
| 6/10/15 | Request 192944: "I WAS TOLD BY FOOD SERVICES TO CONTACT YOUR OFFICE I NEED TO SPEAK WITH SOMEONE ABOUT RAMADAN MEALS SO WE CAN AVOID THE VARIOUS ISSUES EXPERIENCED LAST YEAR." (Doc. No. 26-10 at 10) |
| | Response 192944: Flagged as "not a grievance;" Sustained by W.C. Dennis: "I am glad I was able to speak with you about this matter and clear things up. Peace" (Doc. No. 26-10 at 10) |

| | |
|---|---|
| 7/1/15 | Request 202664: "BESIDES THE FACT THAT THE RAMADAN MEALS OFTEN ARRIVE AT LEAST 15 … MINUTES LATE, I HAVE NOW BEEN INFORMED THAT WE ARE SOMEHOW REQUIRED TO CONSUME THE EQUIVALENT OF TWO FULL MEALS WIHTIN THE STANDARD 20 MINUTE TIME ALOTTED USUALLY, TO THE CONSUMPTION OF ONE MEAL. IT IS RIDICULOUS AND INSULTING TO ATTEMPT TO FORCE US TO GORGE OURSELVES ON TWO MEALS WIHIN A 20 MINUTE PERIOD." (Doc. No. 26-10 at 11) |
| 7/2/15 | Response 202664: Incorrect Group/Recipient;[4] "Food service are nothing to do with this issue please refo [sic] this grievance and send to the right recipient." (Doc. No. 26-10 at 11) |
| 7/10/15 | Request 207419: "THIS CHAPLAIN HAS BEEN ASKED A QUESTION AND IS REFUSING TO GIVE ME AN EXPLANATION, PERTAINING TO MY RELIGIOUS OBLIGATIONS I AM HORRIBLY AGGREIVED BY HIS CALLOUS BEHAVIOR AND OBFUSCATION, I WOULD LIKE TO BE PUT IN CONTACT WITH HIS SUPERIOR…." (Doc. No. 26-10 at 12) |
| 7/13/15 | Response 207419: Sustained, "Issue has been addressed." (Doc. No. 26-10 at 12) |
| | Inmate Appeal 207419: "ISSUE HAS NOT BEEN ADDRESSED AT ALL, IF SO TELL ME IN [W]HAT MANNER HAS THE ISSUE BEEN ADDRESSED. THE CHAPLAIN CAME UP TOLD ME HE WOULD PROVIDE AN EXPLANATION THEN DID NOTHING, SO NO THE ISSUE HAS NOT BEEN ADDRESSED." (Doc. No. 26-10 at 12) |
| 7/30/15 | Response 207419: Closed, "The issue has been addressed." (Doc. No. 26-10 at 12). |
| 10/5/15 | Request 247892: "I NEED TO SPEAK WITH A CHAPLAIN REGARDING AN ISSUE I HAD BETWEEN MYSELF AND OFFICERS REGARDING MY QURAN." (Doc. No. 26-10 at 13) |
| | Response 247892: Flagged as "Grievance – not in favor" by W.C. Dennis; "MCSO has the authority to search property." (Doc. No. 26-10 at 13) |
| 10/27/15 | Response 247892: ACA Code Changed to "Chaplain" by Carolyn Ashe (Doc. No. 26-10 at 13) |

---

[4] The response was originally flagged as "Sustained" on July 2, 2015 but was changed to "Incorrect Group/ Recipient on July 16, 2015. (Doc. No. 26-10 at 11).

| | |
|---|---|
| 3/30/16 | Request 320945: "I AM BEING DENIED MY RIGHT TO PRAY IN CONGREGATION, WOULD LIKE TO SPEAK TO A CHAPLAIN." (Doc. No. 26-10 at 14) |
| | Response 320945: Answered and Closed by Aileen Maddox: "Mr. Muslim, As I stated, the safety and security of the facility is priority. According to policy Muslims may gather for Juma prayer on Fridays between 2 and 3pm. The current understanding is the POD officer has the choice as to whether inmates may gather for other prayer times." (Doc. No. 26-10 at 14) |
| 4/5/16 | Response 320945: Flagged as "Grievance – not in favor" by Carolyn Ashe (Doc. No. 26-10 at 14) |
| 5/7/16 | Request 338243: "I WOULD LIKE TO SPEAK WITH CHAPLAIN DENNIS, ABOUT THIS MATTER PLEASE AT HIS EARLIEST CONVENIENCE" (Doc. No. 26-10 at 15) |
| 5/9/16 | Response 338243: "Answered" by F.W. Tallerico; "visit completed today." (Doc. No. 26-10 at 15) |
| 5/13/16 | Request 341120: "THE DOCTOR HAS CONTACTED THE CHAPLAINS OFFICE AND REMOVED ME FROM THE MEDICAL DIET SO THAT I CAN BE SWITCHED TO KOSHER…." (Doc. No. 26-10 at 16) |
| 5/16/16 | Response 341120: "Denied" by F.W. Tallerico; "No comment given" (Doc. No. 26-10 at 16) |
| | Request 342113: "MY REQUEST WAS ONCE AGAIN CLOSED WITHOUT COMMENT AND MY GRIEVANCE HAS NOT RECEIVE[D] A RESPONSE." (Doc. No. 26-10 at 17) |
| 5/17/16 | Response 342113: Flagged as "Grievance – not in favor" by F.W. Tallerico; "Your request for a kosher diet has been denied" (Doc. No. 26-10 at 17) |
| | Inmate Appeal 342113: "IT WAS SAID THAT I WAS DENIED BECAUSE I AM NOT A FOLLOWER OF THE JEWISH FAITH. I WAS WILLING TO ACCEPT THE KOSHER DIET BECAUSE IT WAS … A RELIGIOUSLY ACCEPTABLE SUBSTITUTE FOR THE HALAL DIET BUT SINCE I WAS DENIED ON THE GROUNDS HTA TI AM NOT A PROFESSED FOLLOWER OF THE JEWISH FAITH AND AFTER THE MEDICAL PERSONNEL JUMPED THROUGH HOOPS TO ACCOMMODATE YOUR OFFICE, I AM AN ACKNOWLEDGED FOLLOWER OF THE ISLAMIC FAITH AND SINCE YOU OFFER THE KOSHER DIET TO JEWISH INMATES I AM REQUESTING THE HALAL DIET AS A MULSIM INMATE, AND SO YOU ARE AWARE |

IT IS NOW 17 DAYS I HAVE GONE WITHOUT A MEAL AND MEDICAL CA[N] VERIFY THAT YOUR OFFICE['S] BIASED DECISIONS IS [sic] INFLICTING PAIN AND SUFFERING UPON ME AS WELL AS SEVERE ANGUISH BY YOUR DECISION TO DENY ME MY RELIGIOUS DIET." (Doc. No. 26-10 at 17)

Response 342113: Flagged as "Grievance – not in favor" by D.G. Wilson; "This grievance has been answered previously and will not be responded to again." (Doc. No. 26-10 at 17)

5/17/16    Request 342551: "THE CHAPLAIN SERVICE IS UNLAWFULLY DENYING THE RIGHT TO EAT WITHIN MY RELIGIOUS CONFINES PLEASE ASSIST ME IN THIS MATTER IT IS NECESSARY THAT I UTILIZE ALL ADMINISTRATIVE REMEDIES." (Doc. No. 26-10 at 18)

5/18/16    Response 342551: Flagged as "Grievance – not in favor" by F.W. Tallerico: "You are being offered the religious meal. Would you like to be placed on the religious diet?" (Doc. No. 26-10 at 18)

Inmate Appeal 342551: "VEGETARIAN FARE IS NOT A RELIGIOUS DIET IT IS A SUBSTITUTE FOR THOSE WHO CHOOSE TO BE VEGAN I AM NOT A VEGAN I AM A MUSLIM, I ASKED FOR THE KOSHER DIET WHICH IS COMPARABLE TO THE HALAL DIET IT IS AN ACCEPTABLE ALTERNATIVE, I AM DENIED BECAUSE I AM NOT JEWISH OKAY SO I AM REQUESTING A HALAL DIET THEN. I AM NOT A VEGAN." (Doc. No. 26-10 at 18)

Request 343034: "I AM NOT A VEGAN I AM A MUSLIM, THEREFORE I AM REQUESTING THE HALA[L] DIET IN THE SAME MANNER JEWISH INMATES ARE AFFORDED THE KOSHER DIET, EATING VEGAN IS NOT A RELIGIOUS DIET WITH ALL DUE RESPECT BECAUSE MY RELIGION DOES NOT REQUIRE THAT I EAT VEGETARIAN FARE. I AM ABLE TO EAT MEAT, HOWEVER MY RELIGION DOES REQUIRE MY FOOD TO BE HALAL. SO I AM REQUSTING A HALAL DIET WHICH IS IN FACT A RELIGIOUS DIET." (Doc. No. 26-10 at 19)

Response 343034: Flagged as "Answered" by F.W. Tallerico; "Request/Grievance previously addressed, we will not continue to respond to the same request/grievance." (Doc. No. 26-10 at 19)

5/19/16    Inmate Response 342551: "THE CHAPLAIN SERVICE AND CHAPLAIN DENNIS IS [sic] COMBATIVE, UNPROFESSIONAL, DISRESPECTFUL, DISHONEST, AND ABUSIVE HIS DEALINGS WITH ME. IF YOU EXAMINE THE RECORD I HAVE BEEN

REQUESTING KOSHER/OR HALAL FARE FOR TWO YEARS NOW AND HE HAS BEHAVED IN THE EXACT SAME DISRESPECTFUL AND DISREGARDFUL MANNER, HE HAS NO REGARD FOR MY RELIGIOUS BELIEFS, NEEDS OR DOCTRINES, HIS IGNORANCE OF THE ISLAMIC FAITH IS STUNNING FOR A MAN CHARGED TO HEAD THE RELIGIOUS SERVICES OF THIS INSTITUTION. MY REQUEST IS CONSTITUTIONALLY VIABLE. PLEASE ASSIST ME IN THIS MATTER." (Doc. No. 26-10 at 18)

5/23/16        Request 344986: "MAY SOMEONE PLEASE ADDRESS THE ISSUE I AM HAVING WITH THE CHAPLAIN OFFICE, THERE [sic] DECISION TO DISALLOW ME EITHER KOSHER OR HALAL FOOD IS A VIOLATION OF MY CONSTITUTIONAL RIGHTS AND EXTREMELY PREJUDICIAL TODAY IS MY 23RD DAY WITHOUT FOOD AND ALL I AM ASKING FROM THEM IS FOOD THAT SATISFIES MY RELIGIOUS REQUIREMENTS. I AM NOT A VEGETARIAN AND THE VEGETARIAN MEAL DOES NOT SATISFY MY REQUIRED PROTEIN INTAKE. SO I AM HUMBLY ASKING THAT CHAPLAIN DENNIS IS STOPPED IN THIS PREJUDICIAL PRACTICE." (Doc. No. 26-10 at 20)

5/24/16        Response 344986: Flagged as "Duplicate" and "Grievance – not in favor" by F.W. Tallerico: "Mr. Muslim, this same grievance has been asked and answered on many occasions and we will not be responding to this same grievance again. You have been offered the religious meal that is in keeping with your indicated religion at intake. Medical has advised they have removed you from the high protein diet, as there is no longer a medical need for this diet at this time. You continue to be offered 3 nutritious meals and a night snack every single day. You choose not to eat the meals." "There are no responses to repeated grievances…." (Doc. No. 26-10 at 20)

5/26/16        Response 342551: Flagged as "Duplicate" by Carolyn Ashe; "There are no responses to repeated/DUPLICATE grievances…." (Doc. No. 26-10 at 18)

5/27/16        Inmate Appeal 344986: "YOUR DEDUCTIONS ARE ERRONEOUS. THE TORQUOISE [sic] DIET IS HIGH PROTEIN BUT IT IS IDENTICAL TO THE REGULAR DIET EXCEPT FOR THE SNACK BAG AT NIGHT THAT IS THE DIFFERENCE. I WAS ONLY CHANGED TO REGULAR DIET BY THE DOCTOR TO ACCOMMODATE THE CHAPLAINS OFFICE MOVING ME TO A KOSHER DIET. BUT AS YOU SEE THE SNACK BAG WAS KEPT IN ORDER TO PROVIDE THE REQUIRED PROTEIN. SO YOUR DEDUCTION IS INCORRECT, AND THE VEGETARIAN DIET WOULD NOT SATISFY MY REQUIRED PROTEIN INTAKE. WHAT IS REALLY DISTURBING IS THAT THE CHAPLAINS OFFICE LIED

AND TRICKED MEDICAL INTO JUMPING THROUGH HOOPS AND MAKING ADJUSTMENTS, THEN TO SIMPLY DENY MY AFTERWARDS." (Doc. No. 26-10 at 20).

5/31/16
Response 344986: Flagged as "Duplicate" by F.W. Tallerico: "There are no responses to repeated grievances." (Doc. No. 26-10 at 20)

6/1/16
Request 348873: "THE DOCTOR PUT IN ORDER FOR MY SNACK BAG TO CONTAIN 3 PEANUT BUTTER 3 JELLY AND 4 SLICES OF WHEAT BREAD. HOWEVER I AM STILL BEING SENT BOLOGNA, PLEASE RECTIFY. ANY QUESTIONS CONTACT DOCTOR BIONDI IN MEDICAL." (Doc. No. 26-10 at 21)

Response 348873: Closed by Kriss Smith: "There are not such instructions on the meal transmittal forms. Any special instructions of this nature would have to be approved by the ARAMARK registered dietician as medically necessary before such changes would be enforced." (Doc. No. 26-10 at 21)

6/3/16
Request 350430: "THERE WAS A REQUEST WHEREIN I WAS TOLD THAT I WAS DENIED THE KOSHER DIET BECAUSE I WAS NOT A PROFESSED FOLLOWER OF THE JEWISH FAITH. NOW I AM LOOKING FOR THAT REQUEST AND THAT REQUEST HAS BEEN DELETED IN ITS ENTIRETY. HOW IS THIS POSSIBLE? AND WHO IS RESPONSIBLE FOR DELETING SAID REQUEST." (Doc. No. 26-10 at 22)

Request 350433: "I WOULD LIKE TO SPEAK TO CAPT. HILL PERTAINING TO A REQUEST THAT HAS BEEN ERASED FROM THE SYSTEM." (Doc. No. 26-10 at 23)

6/6/16
Response 350430: Flagged as "Answered" and "Closed" by F.W. Tallerico: "Previously addressed." (Doc. No. 26-10 at 22)

Inmate Appeal 350430: "THIS HAS NEVER BEEN ADDRESSED I AM ASKING [WHY] THE REQUEST FEATURING OUR CONVERSATION WAS ERASED." (Doc. No. 26-10 at 22)

Response 350433: Flagged "Not a grievance" by Carolyn Ashe: "This is not a grievance. Resubmit a request." (Doc. No. 26-10 at 23)

6/7/16
Inmate Response 350430: "WHO AM I SPEAKING WITH MAY I ASK WHO IS RESPONDING TO MY REQUESTS." (Doc. No. 26-10 at 22)

Request 352167: "THOUGH I AM ACTUALLY ON HUNGER STRIKE THE FACT OF THE MATTER IS I WAS NEVER OFFERED MY

LUNCH OR DINNER IN ORDER TO REFUSE IT. THE RAMADAN MEAL WAS NEVER SENT FOR ME TO REFUSE. THE FOOD SERVICE CAN NOT REFUSE TO AT LEAST OFFER THE MEAL." (Doc. No. 26-10 at 24)

6/8/16          <u>Response 352167</u>: Closed by Tomas Barei: "The kitchen prepared all meals listed on the transmittal for ramadan and sent them at the appropriate time as set by the chaplain. If you did not receive your meal alter the pod officer and he can call the kitchen. if he officer does not call the kitchen we do not know your meal is missing." (Doc. No. 26-10 at 24)

6/16/16         <u>Response 350430</u>: Flagged as "Grievance – not in favor" by D.G. Wilson: "Chaplains unit responds to all requests." (Doc. No. 26-10 at 22).

7/18/16         <u>Response 348873</u>: Flagged as "Grievance – not in favor" by Carolyn Ashe (Doc. No. 26-10 at 21)

7/19/16         <u>Response 352167</u>: Flagged as "Grievance not in favor" by Carolyn Ashe (Doc. No. 26-10 at 24)

## II.     STANDARD OF REVIEW

### (1)     <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving

party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(2)  Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516 (2002). Exhaustion is mandatory. Id. at 524 (citation omitted); Jones v. Bock, 549 U.S. 199, 211 (2007). Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id. A prisoner is not entitled to exhaust administrative remedies during the pendency of an action. Cannon v. Washington, 418 F.3d 714, 719 (7th Cir. 2005); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999). The PLRA requires

"proper" exhaustion, that is, "using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006) (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002)).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones</u>, 549 U.S. at 218. It is well settled that a grievance does not have to mention a defendant by name so long as the grievance gives the defendant fair notice of the claim. <u>See</u> <u>Moore v. Bennette</u>, 517 F.3d 717, 729 (4th Cir. 2008). However, regardless of whether a particular defendant is named in a grievance, if the grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate. <u>See</u> <u>Davidson v. Davis</u>, 2015 WL 996629 at *3 (W.D.N.C. Mar. 6, 2015) (citing <u>Johnson v. Johnson</u>, 385 F.3d 503, 516-17 (5th Cir. 2004)).

**(3)**     **<u>First Amendment</u>**

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment. <u>See</u> <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 699 (1989). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting

governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted). When deciding whether a prison's practice substantially burdens a religious exercise, "courts must not judge the significance of the particular belief or practice in question." Lovelace, 472 F.3d at 187 n.2. A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90.

**(4)    RLUIPA**

RLUIPA provides, in part that no government shall impose a "substantial burden" on the religious exercise of a person residing in or confined to an institution, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation

24

for exercise of their religion." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 721 (2005). A plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. <u>See</u> 42 U.S.C. § 2000cc-2(b); <u>Holt v. Hobbs</u>, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); <u>Smith v. Ozmint</u>, 578 F.3d 246, 251 (4th Cir. 2009). The burden then shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." <u>Ozmint</u>, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." <u>Couch v. Jabe</u>, 679 F.3d 197, 203 (4th Cir. 2012) (quoting <u>Lovelace</u>, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." <u>Cutter</u>, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" <u>Couch</u>, 679 F.3d at 201 (quoting <u>Lovelace</u>, 472 F.3d at 190).

**(5)**     <u>**Equal Protection**</u>

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The equal protection requirement "does not take from the States all power of classification," <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 271 (1979), but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992). To succeed on an equal protection claim, a § 1983 plaintiff "must

first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). If he makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 319–320 (1993). When equal protection challenges arise in a prison context, courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner. See Morrison, 239 F.3d at 654–55. In a prison context, therefore, the court must determine whether the disparate treatment is "reasonably related to [any] legitimate penological interests." Shaw v. Murphy, 532 U.S. 223, 225 (2001). This deferential standard applies "even when the alleged infringed constitutional right would otherwise warrant higher scrutiny;" however, this more deferential review does not ignore the concerns that justify application of a heightened standard outside of the prison context. Morrison, 239 F.3d at 655-56.

**(6)** **Sovereign Immunity**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of Another State, or by Citizens of any Foreign State." U.S. Const. Amend. 11. Thus, § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages are barred absent a waiver by the State or a valid congressional override. Kentucky v. Graham, 473 U.S. 159, 169 (1985). "In an official capacity action, the plaintiff seeks

damages not from the individual officer, but from the entity for which the officer is an agent."
<u>Pusey v. City of Youngstown</u>, 11 F.3d 652, 657 (6ᵗʰ Cir. 1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Graham</u>, 473 U.S. at 166. Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4ᵗʰ Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(7)** **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." <u>Ziglar v. Abbasi</u>, 137 S.Ct. 1843, 1866 (2017) (quoting <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 743 (2011)).

Because qualified immunity is "an immunity from suit rather than a mere defense to

liability ... it is effectively lost if a case is erroneously permitted to go to trial." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis omitted). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 n. 2 (1987). Accordingly, the Supreme Court has "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u> For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 640. This includes consideration of the state of the law at the time of the alleged violation as well as the "information possessed" by the officer to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. <u>Id.</u> at 641. However, an official's subjective belief is irrelevant. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson</u>

v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III.    DISCUSSION

### (1)    Exhaustion

Defendants argue that Plaintiff failed to exhaust his administrative remedies for his claims against Defendants Carmichael and Maddox, claims that Defendants failed to provide an Imam to lead prayer services in violation of the First Amendment and RLUIPA, and the equal protection

29

claim alleging disparate treatment from Christian inmates. Plaintiff contends that he exhausted his administrative remedies on July 13, 2015 at 2:26 PM (Inmate Appeal 207419), May 17, 2016 at 2:39 PM (Inmate Appeal 342113), May 19, 2016 at 9:32 AM (Inmate Response 342551), May 27, 2016 at 2:35 PM (Inmate Appeal 344986), and June 6, 2016 at 7:53 AM (Flag Change 350430).

The record reflects that Plaintiff filed grievances and appeals on his First Amendment, RLUIPA, and equal protection claims that he was being denied a religious diet and that he was being treated differently from similarly situated Jewish inmates with regards to Request and Appeal number 342551. (Doc. No. 26-10 at 18). In Request number 342551, Plaintiff asked for a diet "within [his] religious confines…." (Id.). In Appeal number 342551, Plaintiff stated that "vegetarian fare is not a religious diet …, [he] asked for the kosher diet which is comparable to the halal diet [and] is an acceptable alternative, [and], [he] was denied because [he] is not Jewish … so [he] is requesting a halal diet…." (Id.). This exhausted grievance and appeal sufficiently notified MCSO that Plaintiff was dissatisfied with his religious diet and felt he was being treated differently from similarly situated Jewish inmates. Defendants' argument that these claims were not exhausted with regards to Defendants Carmichael and Maddox is rejected; Plaintiff was not required to specifically name each person who allegedly violated his rights in the grievances. See Moore, 517 F.3d at 729 (NCDPS's administrative remedy procedure does not require a plaintiff to name each defendant in his grievances). Plaintiff placed MCSO on fair notice of his claims and gave Defendants the opportunity to correct them which is sufficient to satisfy PLRA's exhaustion requirement.

However, the record reflects that Plaintiff failed to exhaust his administrative remedies with regards to his First Amendment, RLUIPA, and equal protection addressing prayer services. Plaintiff complained on one occasion about being deprived of the right to pray in congregation,

Request number 320945, but he did not file an appeal and he never filed a request alleging that he was being treated differently from similarly situated Christian inmates with regards to prayer services. <u>See</u> (Doc. No. 26-10 at 14).

Therefore, Plaintiff exhausted his claims about the alleged deprivation of a religious diet but failed to exhaust the claims about prayer services, and therefore the First Amendment, RLUIPA, and Equal Protection Clause claims addressing prayer services will be dismissed without prejudice.

**(2)    <u>First Amendment & RLUIPA</u>**

The first stage is essentially the same for First Amendment and RLIUPA claims wherein the plaintiff must show that the prison's policies "imposed a substantial burden on his exercise of sincerely held religious beliefs." <u>Wright v. Lassiter</u>, __ F.3d __, 2019 WL 1645790 at *3 (4th Cir. April 17, 2019) (citing <u>Carter v. Fleming</u>, 879 F.3d 132, 139-40 (4th Cir. 2018)). If the plaintiff can make that showing, the court goes to the second stage, which diverges under RLUIPA and the First Amendment. Under RLUIPA, the government has the burden to show that its policy satisfies strict scrutiny: that is, the policies must represent the least restrictive means of furthering a compelling governmental interest, and under the First Amendment, the plaintiff has the burden to show that the policies are not "reasonably related to legitimate penological interests." <u>Wright</u>, __ F.3d __, 2019 WL 1645790 at *3; <u>Turner</u>, 482 U.S. at 89.

Plaintiff alleges that the right to practice his sincerely held Muslim faith was substantially burdened by Defendants' denial of a kosher diet, that meals were sometimes missing or late, and that he was only given 20 minutes to consume the equivalent of two meals each day during Ramadan. Defendants argue that Plaintiff's right to eat religious meals was never substantially burdened.

As a preliminary matter, there is no evidence that Defendant Maddox was personally involved in the decisions surrounding Plaintiff's religious diet, so she is entitled to summary judgment on this basis alone.[5] See generally Fed. R. Civ. P. 8(a)(2) (a short and plain statement of the claim is required); Dickson v. Microsoft Corp., 309 F.3d 193, 201-02 (4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim).

The unrebutted evidence reveals that Plaintiff's rights under the First Amendment and RLUIPA were not violated. Plaintiff was placed on a medical diet high-protein diet on January 17, 2014. (Doc. No. 26-5 at 2). Inmates on medical diets at the Jail cannot receive religious unless permission is authorized in writing by a Jail doctor, certifying that the religious meal will not affect the inmate's health. (Doc. No. 26-3 at 5) (declaration of Frank Tallerico). Plaintiff claims that he discovered in "early 2015" that a modified kosher diet would satisfy his religious and dietary needs. (Doc. No. 1 at 3). Plaintiff filed Request 127701 on January 27, 2015 asking to be placed on a "kosher diet" plus a peanut butter bag lunch. (Doc. No. 26-10 at 7). That request was denied the same day because all requests for religious meals must go through the chaplain. (Id.). Plaintiff complained several times that he never received a response, (Doc. No. 26-10 at 8, 9), then spoke with Defendant Dennis on June 10, 2015, (Doc. No. 26-10 at 10). Plaintiff made no more requests for a kosher diet for over a year. On May 12, 2016, medical staff approved Plaintiff to discontinue the high protein diet so that he could pursue a "regular house diet or religious diet...." (Doc. No. 26-10 at 16). On May 12, Plaintiff "was allowed to have a regular house diet or religious diet" and he was also provided an evening snack back with one serving of peanut butter. (Doc. No. 26-4 at

---

[5] Defendants' argument that summary judgment should also be granted for Defendant Carmichael because he lacked personal involvement in Plaintiff's case is rejected. Construing the Complaint liberally, it appears that Plaintiff is contesting the constitutionality of the Jail policy to deny non-Jewish inmates a kosher diet, so Defendant Carmichael may be liable under a supervisory theory even if he was not personally involved in Plaintiff's dietary decisions. See generally Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

3) (declaration of Head Nurse Sheila Burns). The following day, May 13, 2016, Plaintiff filed Request 341120 indicating that he had been removed from a medical diet and asking to be switched to a kosher diet. (Doc. No. 26-10 at 16). The request for a kosher diet was denied but he continued to be offered the religious vegetarian diet. (Id.); see (Doc. No. 26-10 at 18). The Jail's religious vegetarian diet "complies with all the rules of dietary needs for all religious beliefs, except for prisoners who require kosher diets." (Doc. No. 26-2 at 3) (declaration of Aramark Food Services Manager Tom Barei); see (declaration of MCSO Inmate Program Specialist Frank Tallerico stating that it is forbidden for Muslims to eat ham, pork, or animal blood).

Plaintiff has failed to demonstrate a genuine issue of material fact with regards to whether Defendants substantially burdened his religious rights with regards to meals. Defendants have presented evidence that, when Plaintiff was medically approved to stop his medical diet, a religious diet was made available to him.[6] Provision of a vegetarian religious diet that did not include meat, as Plaintiff would prefer, was not a substantial burden on his religion. See, e.g., Robinson v. Jackson, 615 Fed. Appx. 310 (6th Cir. 2015) (the fact that vegetarian meals were not to Muslim prisoner's liking, and he would have preferred halal meat entrees, did not establish a First Amendment or RLUIPA violation; the meals met his nutritional needs and did not include any prohibited food).

Plaintiff's present claim that his religious beliefs *require* him to eat meat is refuted by the record.[7] When Plaintiff requested a kosher/halal diet that includes meat, he explained that he is not

---

[6] Although Plaintiff alleges in his Complaint that he was forced to eat a non-halal meat diet while he was on the medical high-protein diet, he does not allege that he asked medical to remove him from the high-protein diet until May 12, 2016, that any Defendant other than Defendant Dennis knew that he had requested a religious diet prior to his removal from the medical diet, or that Defendant Dennis had the authority to remove Plaintiff from a medical diet and place him on a religious diet without medical authorization.

[7] This claim is also unexhausted because it was never fairly presented to MCSO.

a vegetarian, meat is not *prohibited* by his religion, and he requires a high amount of protein. However, he never alleged that his religious beliefs *require* the consumption of meat. See (Doc. No. 26-10 at 19) (Request 343034 stating "[his] religion **does not require … vegetarian fare. [He is] able to eat meat**, however [his] religion does require [his] food to be halal.") (emphasis added); see also (Doc. No. 26-10 at 7) (Request 127701 stating that he does not "want" the religious diet because it is essentially vegetarian fare and he is on a diet dealing with weight loss issues); (Doc. No. 26-10 at 17) (Request 342113 stating that he will accept a kosher diet because it is a religiously acceptable substitute for a halal diet); (Doc. No. 26-10 at 18) (Request 342551 stating that he is being denied "the right to eat within [his] religious confines" and that "vegetarian fare is not a religious diet … I am not a vegan I am a Muslim"); (Doc. No. 26-10 at 20) (Request 344986 asking for "food that satisfies [his] religious requirements. [He] is not a vegetarian and the vegetarian meal does not satisfy [his] required protein intake."). Plaintiff's new claim that his religion requires him to eat meat is blatantly contradicted by the record and will be rejected. See Scott v. Harris, 550 U.S. 372, 380 (2007) (although the court does not make a credibility determination on summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); see, e.g., Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) (affirming summary judgment for defendants on a claim of excessive force where, after viewing video recordings of two alleged incidents of excessive force, the district court concluded that no reasonable jury could find that the correctional officers had applied force maliciously and sadistically for the purpose of causing harm).

Plaintiff's other allegations, that meals were occasionally late or missing and that he was

given a short time period within which to consume two meals during Ramadan, are not sufficiently serious to constitute a substantial burden on Plaintiff's religion, but rather, are mere inconveniences. Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007), *abrogated on other grounds by* Sossamon v. Texas, 563 U.S. 277 (2011), ("at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious … observance was more than an inconvenience to one's religious practice").

Defendants have demonstrated that Plaintiff was provided with a religious diet that complied with Islamic religious requirements by omitting ham, pork and animal blood. Plaintiff has failed to create a genuine dispute of material fact with regards to the provision of a religiously acceptable diet. He has submitted no evidence that he was pressured to forego his religious beliefs. Plaintiff has therefore failed to demonstrate that his religious practice has been substantially burdened with regards to the religious diet he was offered at the Jail, and the Court need not proceed to the second prong of the RLUIPA and First Amendment analyses.

Defendants' Motion for Summary Judgment will therefore be granted on Plaintiff's First Amendment and RLUIPA claims.

**(3)    Equal Protection**

Plaintiff's equal protection claim requires a showing that a similarly situated class of inmates was treated differently based on a suspect classification or fundamental right, that the discrimination was intentional or purposeful, and that difference in treatment is not reasonably related to a legitimate penological justification.

Plaintiff contends that he, as a Muslim, was denied a kosher diet or halal meat whereas similarly situated Jewish inmates receive diets that include kosher meat. Plaintiff has established that he is the member of a suspect classification. See Giarratano v. Johnson, 521 F.3d 298 (4th Cir.

2008) (religion is a suspect classification). The evidence indicates that Plaintiff was treated similarly to Jewish inmates in that he was offered a religious diet consistent with halal requirements just as Jewish inmates are offered kosher diets that satisfy their religious dietary restrictions. [8]

Even if Plaintiff was treated differently from similarly situated Jewish inmates, his equal protection claim still fails because there is no evidence that Defendants acted with a discriminatory purpose. The undisputed evidence shows that MCSO consulted with religious leaders and reasonably believed that the Jail's religious diet satisfies Muslim dietary requirements. See (Doc. No. 26-3) (declaration of Inmate Program Specialist Frank Tallerico, stating that, based on his understanding of Islamic law pursuant to conversations with Islamic religious authorities, it is forbidden for Muslims to eat ham, pork, or animal blood); (Doc. No. 26-2) (declaration of Ararmark Food Services Manager Tom Barei stating that the religious diet meets the dietary needs of religious inmates who require a pork-free diet and has been certified to meet or exceed minimum daily nutritional requirements). Plaintiff has not come forward with any evidence demonstrating that Defendants' denial of kosher or halal meat was the product of intentional discrimination. See, e.g., Robinson v. Jackson, 615 Fed. Appx. 310 (6th Cir. 2015) (plaintiff failed to state a valid equal protection claim because, assuming that plaintiff was denied a diet consistent with halal requirements and that similarly situated Jewish inmates received kosher meals, he failed to allege that the department of corrections was not providing halal meals pursuant to intentional or purposeful discrimination); Muhammad v. Sapp, 388 Fed. Appx. 892 (11th Cir. 2010) (prisoner

---

[8] The record reveals that Plaintiff was offered a religious diet as soon as he was medically eligible and that he went on a hunger strike because the Jail's religious diet is vegetarian, and not because the offered diet did not comply with Muslim dietary requirements. Plaintiff has not come forward with any evidence to dispute the Defendants' evidence that the religious diet complies with the halal requirements as determined by MCSO after consulting with Muslim authorities.

alleging that defendants provided Jewish inmates with a kosher diet and did not provide Muslim inmates with a halal diet failed to establish equal protection claim, and defendants were thus entitled to qualified immunity, where prisoner the facts viewed in the light most favorable to prisoner did not establish that the prison's decision to serve kosher meals but not halal meals was the product of intentional discrimination); <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 815-16 (8th Cir. 2008) (prisoner's equal protection claim failed because he did not show that the prison's decision to serve kosher entrees and not halal entrees was motivated by intentional or purposeful discrimination).

Moreover, the evidence shows that the difference in treatment between Jewish and Muslim inmates is reasonably related to legitimate penological justifications. Providing Muslim inmates with halal meat would require separate storage facilities, cooking areas, and utensils. (Doc. No. 26-2 at 3). The cost of purchasing halal meat would be "prohibitively expensive," and there would be increased costs associated with providing separate storage facilities, cooking areas, ovens, and cooking utensils for halal meats). (<u>Id.</u>). The Jail's religious diet "complies with all the rules of dietary needs for all religious beliefs, except for prisoners who require kosher diets." (<u>Id.</u>). Kosher meals have special restrictions that prohibit preparing meat and dairy at the same time so kosher meals are specially ordered. (<u>Id.</u>). Kosher meals cost approximately $5.25 per meal rather than other meals that cost $.95. (<u>Id.</u>). There is little space in the kitchen to prepare kosher meals and there is one microwave, it takes about six minutes for a kosher meal to be cooked, and meals cannot be mixed. (<u>Id.</u>). Plaintiff has not come forward with any evidence disputing these legitimate penological justifications.

Plaintiff has failed to put forth sufficient evidence to demonstrate the existence of a genuine dispute of material fact with regards to his equal protection claim and, therefore, Defendants'

Motion for Summary Judgment will be granted on this claim.

**(4)**     **Official Capacity**

Defendants argue that the claims against Defendants Dennis and Maddox in their official capacities should be dismissed because they are redundant of the official capacity claims against Sheriff Carmichael, and that Plaintiff's official capacity claims for damages under RLUIPA should be dismissed as unauthorized.

 "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985); see Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 (1978) (official capacity claims "represent only another way of pleading an action against an entity of which an officer is an agent."). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

The Court agrees with Defendants that the official-capacity claims against Dennis and Maddox are redundant of the claims against the Sheriff, and they will be dismissed. See, e.g., Ramsey v. Schauble, 141 F.Supp.2d 584 (W.D.N.C. 2001) (dismissing a claim against a deputy as redundant of an official capacity claim against the sheriff).

Further, "RLUIPA does not authorize claims for official or individual capacity damages…." Rendelman v. Rouse, 569 F.3d 182, 189 n.2 (4th Cir. 2009). The claims against all Defendants for damages in their official capacities under RLUIPA will therefore be dismissed.

Plaintiff's official capacity claims against Defendants Dennis and Maddox, and his official

capacity claims against all Defendants for damages under RLUIPA will therefore be dismissed.

**(5)** <u>**Individual Capacity**</u>

Defendants argue that they are entitled to qualified immunity on Plaintiff's individual capacity claims, and that the claims against them in their individual capacities for damages under RLUIPA should be dismissed as unauthorized.

In reviewing a claim of qualified immunity, a court first considers whether the plaintiff has alleged a constitutional violation and, if so, whether the right was clearly established at the time.

Plaintiff has failed to demonstrate that any violation of his constitutional rights occurred for the reasons set forth in the foregoing sections. <u>See</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991) (the qualified immunity analysis is satisfied if it appears that the plaintiff has failed to demonstrate a constitutional violation). Even if such a violation had occurred, Plaintiff has failed to demonstrate that it was clearly established at the time of the alleged violation that Defendants were required to provide him with either halal or kosher meals that include meat in lieu of a vegetarian religious diet. <u>See</u> <u>Thompson v. Williams</u>, 320 Fed. Appx. 678, 679 (9th Cir. 2009) (affirming summary judgment for defendants on prisoner's claims under the First Amendment, RLUIPA and Equal Protection that defendants refused to provide him with a halal or kosher diet because "it was not clearly established at the time of the violation that the defendants were required to provide him with either Halal or Kosher meals with meat in lieu of an ovo-lacto diet."). It was objectively reasonable for Defendants to believe, at the time, that offering Plaintiff religious meals that are consistent with Muslim dietary restrictions did not violate Plaintiff's rights. <u>See</u>, <u>e.g.</u>, <u>Barnes v. Furman</u>, 629 Fed. Appx. 52 (2d Cir. 2015) (it was not unreasonable for prison officials to deny plaintiff kosher meals in accordance with prison policy limiting kosher meals to Jewish inmates, because plaintiff was registered as "Hebrew Israelite;" nor was it unreasonable for prison officials

to rely on plaintiff's registered religious designation in making its initial kosher meal determination and, once the Central Office determined that the policy should be changed, plaintiff was granted kosher meals).

"RLUIPA does not authorize claims for official or individual capacity damages…." Rendelman, 569 F.3d at 189 n.2. Therefore, Plaintiff's claims for damages against Defendants in their individual capacities under RLUIPA will be dismissed as unauthorized.

Defendants' Motion for Summary Judgment will therefore be granted on because Defendants are entitled to qualified immunity, and because damages claims are not authorized under RLUIPA.

**(6)** **Mootness**

Finally, Defendants argue that Plaintiff's requests for injunctive relief are moot because he no longer resides at the Jail.

A prisoner's transfer moots a § 1983 request for declaratory and injunctive relief when the conditions of which the prisoner claims are unlikely to recur. See Williams v. Griffin, 952 F.2d 820 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986).

Defendants assert, and Plaintiff does not dispute, that he has been transferred to the Federal Bureau of Prisons where he is serving a life sentence. His claims for injunctive relief are therefore moot and will be dismissed.

## IV. MOTION TO STRIKE

Defendants have moved to strike Plaintiff's Surreply to Defendants' Motion for Summary Judgment. (Doc. Nos. 44, 45).

District courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases. See Dietz v. Bouldin, 136 S.Ct. 1885

(2016). Part of the courts' inherent authority is the authority to strike documents. <u>See</u> <u>Iota Xi Chapter of Sigma Chi Fraternity v. Patterson</u>, 566 F.3d 138, 150 (4th Cir. 2007) (addressing the authority to strike documents outside of Federal Rule of Civil Procedure 12(f)). This Court's Local Rules provide that "[s]urreplies are neither anticipated nor allowed by this Rule, but leave of Court may be sought to file a surreply when warranted." LCvR 7.1(e).

Plaintiff filed his Surreply without leave of Court and is therefore subject to being stricken. However, even if the Surreply had been authorized, it would not affect the outcome of these proceedings for the reasons set forth in Defendants' Motion to Strike. Therefore, the Motion to Strike will be granted and, even if it was denied, the Court would still grant Defendants' Motion for Summary Judgment.

## V.     CONCLUSION

In sum, for the reasons stated herein, Defendants' Motion for Summary Judgment is granted, Defendants' Motion to Strike is granted, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 26), is **GRANTED**.

2. Defendants' Motion to Strike Plaintiff's Surreply, (Doc. No. 45), is **GRANTED**.

3. The Clerk of Court is instructed to close this case.


Signed: April 23, 2019


Frank D. Whitney
Chief United States District Judge

41